IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON ROSE,<br><br>                Plaintiff,<br>    v.<br><br>SAMUEL ABRAHAM, BELLA ROBLES CORP., INC., STEVEN DUCE, RICHARD WYNN, and BANK OF THE SIERRA,<br><br>                Defendants. | CIV F 08-606  AWI SMS<br><br>ORDER ON PLAINTIFF'S SECOND EX PARTE MOTION FOR WRIT OF ATTACHMENT OR TEMPORARY PROTECTIVE ORDER<br><br>(Doc. No. 13) |

      Plaintiff Don Rose ("Rose") seeks an *ex parte* writ of attachment or alternatively an *ex parte* temporary protective order to secure approximately $400,000 from a particular bank account with Defendant Bank of the Sierra.  Specifically, Rose seeks an order prohibiting Defendant Samuel Abraham ("Abraham") from directing Defendants Bella Robles Corp. ("Bella") and Steven Duce ("Duce") from distributing funds from an escrow account held for the benefit of Abraham and Rose, and by extension directing Bella and Duce from diminishing the account.  For the reasons that follow, Plaintiffs' motion for an *ex parte* temporary protective order will be granted.[1]

---

[1] This is Rose's second *ex parte* application.  The Court denied the first motion without prejudice. See Court's Docket Doc. No. 11.

**BACKGROUND**

Defendant Samuel Abraham ("Abraham") represented to Rose that Abraham could obtain a $100 million loan for Rose. See Supplemental Rose Declaration at p.2. Abraham said he would obtain the loan for Rose and two other investors for a fee of $2.15 million per month for 13 months. See id. Rose signed an agreement/contract with Abraham, who claimed to be doing business as the trustee of Sunrise Trust Ltd., for obtaining the loan. See id. The agreement required Defendant Richard Wynn ("Wynn") to acquire the $100 million from Credit Suisse. See id. Rose and others were to send the first month's fee to Duce and Bella, which held itself out as "Bella Robles Escrow Corporation." See id. The $2.15 million fee was to be held in escrow by Bella and Duce until Rose confirmed the receipt of the $100 million, at which time the escrow account would be distributed to Abraham. See id. Rose contributed $1.5 million, while two other investors contributed the remaining $650,000. See id. The $2.15 million was to be transferred into Bella's account with Sierra. See id. at pp. 2-3. Rose also had an account with Sierra. See id.

On January 28, 2008, Rose had his $1.5 million transferred from his Sierra account to Bella's Sierra account. See id. at p. 3. Bella's account with Sierra is 2220359270. See id.

Shortly thereafter, Abraham told Rose that the loan process was becoming complicated. See id. at 3. Wynn said that Abraham was working diligently and may have already secured the deal. See id. Rose then began looking into the deal with the aide of a loan officer. See id. Duce admitted that he was making $5,000 for holding the money, and then stopped communicating to Rose about the deal. See id.

Next, Rose learned that Abraham was on conditional release in the Eastern District of Michigan. See id. Abraham was to turn himself in and serve a 54 month sentence for tax crimes, wire fraud, and other fraud related crimes. See id. The sentence recommends treatment for gambling addiction and drug use. See id. It also appears that Abraham's contact with Rose violated the terms of the conditional release.[2] See id. Abraham is on conditional release until

---

[2]Rose's Declaration has attached to it copies Abraham's indictment, plea, and conditions of release. Part of the conditions of release prohibited Abraham from soliciting investors. See Exhibits D & F at p. 2.

1   June 9, 2008.  See id. at p. 4.  Abraham is also to pay nearly $7 million in restitution to five
2   victims.  See Rose Exhibit C at pp. 9-10.
3          At some point, Rose's $1.5 million was dispersed.  After filing suit in May 2008, Duce
4   informed Rose that in excess of $400,000 remained in account 2220359270.  See id.  Duce also
5   informed Rose that the remainder of the $1.5 million had been transferred to the accounts of
6   various persons, including at least $700,000 to Abraham.  See id. at 4.  Rose declares that Duce
7   was to act as an escrow agent, but instead disbursed over $1 million, without Rose receiving
8   anything in return.  See id.  Duce told Rose that he made certain distributions from the account of
9   over $1,000,000 at Abraham's direction.  See id. at pp. 4-5.
10         Duce has told Rose's counsel that account 2220359270 is currently frozen by Sierra,
11  along with other accounts.  See Herr Declaration at 2.  It is unknown how long the freeze will
12  last.  See id.  Abraham and Wynn have not been located.  See id.  Efforts to locate these
13  Defendants have been unsuccessful and some addresses given by Abraham do not actually exist.
14  See id.  Duce is no longer communicating with Rose.  See Supplemental Rose Declaration at p.
15  5.
16         Rose seeks to secure $1.5 million by way of attachment, or whatever portion of that
17  amount remains in account 2220359270.  See id. at 5.  Rose seeks the attachment for purpose of
18  securing recovery on his breach of contract claim against Abraham as alleged in the complaint,
19  and for no other purpose.  See id.  Rose has no information or belief that his claim has been
20  discharged in bankruptcy under Title 11, or that prosecution of this action is stayed under such a
21  proceeding.  See id.  The property to be attached is those moneys in Sierra account 2220359270;
22  the money in the account was deposited by Rose pursuant to his agreement with Abraham.
23  See id.  The property (the money in account 2220359270) is not exempt from attachment; the
24  money is in an escrow account and Rose seeks attachment so as to secure recovery in a breach of
25  contract action against Abraham.  See id.  Rose declares that, considering Abraham's criminal
26  activity, gambling and drug addiction, and Duce's willingness to improperly distribute  money at
27  Abraham's request, Rose believes that Abraham will gain access to the remaining funds and the
28  remaining funds will be distributed.  See id. at pp. 4-6.

**LEGAL FRAMEWORK**

*Federal Rule 64*

In pertinent part, Rule 64 provides that, "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . ." Fed. R. Civ. P. 64.  Thus, Rule 64 "permits state seizure provisions to be used in federal courts . . ." Reebok Int'l v. Marnatech Enters., 970 F.2d 552, 558 (9th Cir. Cal. 1992); Pos-A-Traction, Inc. v. Kelly-Springfield Tire Co., 112 F. Supp. 2d 1178, 1181 (C.D. Cal. 2000) (noting that Rule 64 incorporates state law for prejudgment seizures of property).

*Temporary Protective Orders*

In conjunction with applying for a writ of attachment, California law permits a litigant to apply for a temporary protective order ("TPO").  See Cal. Code Civ. Pro. § 486.010(a).  The TPO application "shall state what relief is requested and shall be supported by an affidavit, which may be based on information and belief, showing that the plaintiff would suffer great or irreparable injury if the temporary protective order were not issued."  Cal. Code Civ. Pro. § 486.010(b). Examples of "irreparable injury" are codified and include, "Under the circumstances of the case, it may be inferred that there is a danger that the property sought to be attached would be concealed, substantially impaired in value, or otherwise made unavailable to levy if issuance of the order were delayed until the matter could be heard on notice."  Cal. Code Civ. Pro. § 485.010 (b)(1).  The California Code of Civil Procedure provides the following criteria for the issuance of a TPO on an *ex parte basis*:

> The court shall examine the application, supporting affidavit, and other papers on record and shall issue a temporary protective order, which shall state the amount sought to be secured by the attachment under the application for the right to attach order, upon the filing of an undertaking as provided by Sections 489.210 and 489.220, if it finds all of the following:
>
> (a) The claim upon which the application for attachment is based is one upon which an attachment may be issued.
>
> (b) The plaintiff has established the probable validity of the claim upon which the application for the attachment is based.

4

    (c) The order is not sought for a purpose other than the recovery upon the claim upon which the application for the attachment is based.

    (d) The plaintiff will suffer great or irreparable injury (within the meaning of § 485.010) if the temporary protective order is not issued.

Cal. Code Civ. Pro. § 486.020.

As summarized by the Ninth Circuit:

> California law allows a creditor to obtain a TPO against a debtor's property after it has shown in an *ex-parte* proceeding the probable validity of its claim and the probability of great harm if relief is not granted.  The TPO creates a lien on all of the debtor's named property which survives most transfers. The creditor can then obtain an order to attach and a writ of attachment after notice and a full hearing.  At the hearing, the creditor must show that, on the facts presented, it would be entitled to judgment on the claim on which the attachment is based..

In re Wind Power Systems, Inc., 841 F.2d 288, 291 (9th Cir. Cal. 1988).

Attachment is proper "only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claims is a fixed or readily ascertainable amount not less than [$500].  Cal. Code Civ. Pro. § 483.010(a); Koninklijke Phillips Electronics N.V. v International Disc. Manufacturers, 2006 U.S. Dist. LEXIS 96204, *12 (C.D. Cal. 2006).  Also, if the claim is against a natural person, the claim must arise out of conduct by the defendant of a trade, business or profession.  Cal. Code Civ. Pro. § 483.010(c). "Probable validity" requires the plaintiff to "show that it is more likely than not it will obtain a judgment against the defendant."  Koninklijke, 2006 U.S. Dist. LEXIS 96204 at *14; Pos-A-Traction, 112 F.Supp.2d at 1182.   Before a temporary protective order will issue, "the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action," Cal. Code Civ. Pro. § 489.210, but the amount of the undertaking is generally $10,000.  See Cal. Code Civ. Pro. § 489.220; see also Vershbow v. Reiner, 231 Cal.App.3d 879, 882-83 (1991).  A TPO will last either 40 days, a period of less than 40 if ordered by the Court, or when a levy of attachment upon the specified property is made by the plaintiff.  See Cal. Code Civ. Pro. § 486.090.  The attachment statutes are given strict construction.  See Vershbow, 231 Cal.App.3d at 882-83.

**RESOLUTION**

The Court believes that a TPO is appropriate. See Cal. Code Civ. Pro. §§ 486.010, 486.020. First, the TPO application is based on a claim for which attachment may issue. The basis of Rose's applications for *ex parte* attachment and TPO are based on an express contract for professional services with Abraham. The amount of Rose's claim is readily ascertainable since Rose's claim is based on his performance of depositing $1.5 million. Also, there is no indication that real property is involved in the transaction. See Cal. Code. Civ. Pro. § 483.010. Second, Rose's declaration indicates that it is more likely than not that he will prevail against Bella and Duce. See id. Rose's declaration indicates that he paid $1.5 million to Bella and Duce, who distributed most of those funds to Abraham at Abraham's direction, and that the $100 million was never obtained by Abraham. Third, there is no indication that the TPO is requested a purpose other than the recovery upon the breach of contract claim against Abraham. Finally, as described by statute, there is a danger that if the TPO does not issue, the approximately $400,000 remaining in the escrow account may be dispersed or otherwise made unavailable. Abraham has been able to successfully direct Bella and Duce to improperly distribute funds, supposedly being held in escrow. Further, given Abraham's past criminal conduct, plea bargain which requires millions in restitution, apparent gambling and drug addictions, and Rose's inability to locate Abraham, it appears Abraham is in a tenuous condition. Although it is true that there is some form of "freeze" on account 2220359270, this appears to be an internal practice by Sierra, it is unknown how long the "freeze" will remain in effect, Duce is not communicating with Rose, Abraham cannot be found, Abraham has already improperly gained a significant portion of these funds, and Abraham appears to have violated his conditions for release viz a vie his conduct with Rose. Given this history and the unknown nature and duration of the "freeze" on the account by Sierra, Rose has shown that there is a danger that the remaining $400,000 in the account will be improperly dissipated or otherwise made unavailable by Abraham. See Cal. Code Civ. Pro. § 485.010(b)(1). Rose has sufficiently shown irreparable injury if the TPO is not issued.[3]

---

[3] The Court notes that the likely effect of the TPO would be to keep Sierra's "freeze" in effect; that is, to maintain the status quo.

However, before the TPO may issue, Rose must file an undertaking for $10,000. See Cal. Code Civ. Pro. §§ 486.020, 489.210, 489.220. Once Rose posts the undertaking and the Court signs an additional order, the TPO will go into effect. Further, a noticed hearing will be held on Rose's application for right to attach and writ of attachment. See In re Wind Power, 841 F.2d at 291.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's *ex parte* request for temporary protective order is conditionally GRANTED;
2. The temporary protective order will go into effect upon the filing of the statutorily required $10,000 undertaking by Plaintiff and the signing of a separate order from this Court;
3. Plaintiff must file the undertaking within fourteen (14) days of service of this order;
4. Should Plaintiff fail to file the undertaking within fourteen (14) days of this order, then no temporary protective order or attachment will issue and Plaintiff's motion will be deemed DENIED in full;
5. Plaintiff must also file contemporaneously with the undertaking a proposed Temporary Protective Order; and
6. Upon the filing of the undertaking and the proposed temporary protective order, the Court will set a briefing schedule and a hearing date for the hearing on Rose's motion for writ of attachment.

IT IS SO ORDERED.

**Dated:  May 21, 2008**             /s/ **Anthony W. Ishii**
                                    UNITED STATES DISTRICT JUDGE

7